2025 IL App (2d) 230378-U
No. 2-23-0378
Order filed September 29, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CF-1874 |
| JESUS J. MACIEL FACIO, | ) ) ) | Honorable Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Mullen concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Trial court issued inconsistent verdicts on two counts of aggravated criminal sexual abuse and, thus, we vacate the conviction and sentence issued for one count. The evidence was otherwise sufficient to sustain defendant's remaining convictions. Affirmed in part and vacated in part.

¶ 2   After a bench trial, defendant, Jesus J. Maciel Facio, was convicted of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)), aggravated criminal sexual abuse (*id.* §11-1.60(b)), and indecent solicitation of a child (*id.* §11-6(a)). Defendant appeals, raising claims concerning inconsistent verdicts/double jeopardy and the sufficiency of the evidence. For the following reasons, we affirm in part and vacate in part.

¶ 3                                    I. BACKGROUND

¶ 4      On November 15, 2021, defendant was charged by indictment with predatory criminal sexual assault of a child (count I), five counts of aggravated criminal sexual abuse (counts II through VI), and one count of indecent solicitation of a child (count VII).  The charges concerned defendant and E.C., his stepdaughter, and his alleged touching with his hand of E.C.'s sex organ (counts I, V, and VI), breast (counts II and III), and buttock (count IV), as well as his solicitation of E.C. that she touch his sex organ (count VII).  Count I alleged that E.C. was under age 13 at the time of the offense, while counts II through VII alleged that E.C. was under age 18.  As relevant to this appeal, counts II and III were worded identically, except that count II charged that defendant committed "an act" (*i.e.*, that he touched E.C.'s breast with his hand) on or about "June 12, 2016[,] through June 11, 2019," whereas count III alleged that he committed the act on or about "June 12, 2016[,] through July 31, 2021."  The allegations that defendant touched E.C.'s breast were general and did not reference specific incidents.  Specifically, count II alleged, in relevant part, "on or about *June 12, 2016[,] through June 11, 2019*, *** defendant, a family member of E.C., committed an act of sexual conduct with E.C., a person under 18 years of age when the act was committed, in that the defendant touched the breast of E.C. with his hand for the purpose of sexual arousal or gratification of the defendant or the victim."  Count III, in turn, alleged, in relevant part, "on or about *June 12, 2016[,] through July 31, 2021*, *** defendant, a family member of E.C., committed an act of sexual conduct with E.C., a person under 18 years of age when the act was committed, in that the defendant touched the breast of E.C. with his hand for the purpose of sexual arousal or gratification of the defendant or the victim."

¶ 5      Trial commenced on June 2, 2023.  E.C. testified that her birthday is June 12, 2007, and that she was almost 16 years old. She is the eldest child and has five younger siblings.  She and

one sibling have a different father, while defendant is the father of three of the remaining children. Defendant lived with her mother and siblings at their home in St. Charles. When she was around nine years old, defendant made her feel uncomfortable on multiple occasions. E.C. described a time when she was in middle school (between 2016 and 2020), which she said was when she was 12 to 14 years old. She and defendant were alone in a car. E.C. testified that defendant was driving, and she was in the passenger seat; they were going to pick up a seafood platter from a restaurant. The restaurant was around 10 minutes from their home, and, while she had not been inside the restaurant, they had eaten food from there before. She testified that defendant put his hand down her shorts and started touching her "in and around" her vagina. E.C. was wearing underwear, and defendant's hand went underneath it, was feeling around, and went inside her vagina. After they picked up the seafood tray, E.C. placed it on her lap so that defendant could not touch her on the ride home.

¶ 6 At the house, defendant made E.C. uncomfortable in the living room and her bedroom. In the living room, she, her mother, defendant, one of her brothers, and two of her sisters were watching a movie on the "L-shaped" couch. In terms of dates, she believed it happened when she was in middle school and recalled that one of her younger brothers, D.M., was not yet born. She could not specifically recall her brother's birthday, as there are "too many" to remember. E.C. testified that defendant called her over to where he was sitting, put a blanket over both of them, and put his hand down her pajama bottoms and underwear and felt around her vagina. Her family was seated on the other side of the couch.

¶ 7 One day, in her bedroom, E.C. was sitting in a beanbag chair wearing "onesie" style pajamas. Specifically, in middle school, she sometimes wore before and to bed a one-piece pajama outfit that had a zipper and one button at the top. Defendant came into the room, unzipped the

onesie, and touched her breasts. She did not remember how old she was, and her family members were in other rooms of the house. When asked if there were other times that defendant touched her breasts, E.C. said it happened multiple times, but could not recall specifically any other memorable incidents. She testified that, on one occasion, she could not recall when, defendant pulled her onto his lap and forced her to kiss him. On another occasion, after he had moved out and he came to pick up his kids, he gave E.C. a hug and touched her buttocks.

¶ 8    E.C. testified that defendant tried to force her to touch him one night when he came home late from work and was drunk. Her mother was at work. In the living room, defendant asked E.C. to rub his stomach and then, while she was doing so, grabbed her hand and tried to force it down his pants. She could not recall her age. Defendant wore Mickey Mouse sweatpants at the time. The State asked E.C. whether, when defendant was trying to force her to touch him, his clothes changed in any way or if anything happened to them, and E.C. responded, "Um, not that I remember." She testified that defendant did not successfully place her hand on his private part or on any part of his body. Defendant pulled his pants down in front of her, and she pushed him off of her, got up, and went to her room. E.C. testified that defendant followed her into her room and tried to get her to go upstairs to sleep with him.

¶ 9    When defendant touched her, it made her "extremely uncomfortable." He would tell her not to tell anyone because her mother needed him, no one would believe her, and people would think that she was a "slut." She called or texted her mother once, when she was at work, to tell her defendant made her uncomfortable. However, she did not tell her parents or another adult about the incidents while they were happening because she did not want defendant taken away and wanted her siblings to have a normal childhood with their father. Around October 2021, several

months after defendant had moved out of the house, she told her mother what had happened, her mother contacted the police, and E.C. was interviewed at the child advocacy center.

¶ 10    E.C. further testified that, when defendant lived in the house, he lied to her mother about her behavior, it was an ongoing problem, and, when she "talked back" about how he was lying, it would cause a lot of fights and the fighting did not stop until he moved out.  More specifically, according to E.C., defendant stated that she was irresponsible, failed to do chores, or had "talked back;" sometimes it was true, but, "a lot of times," it was not.  She felt that defendant did not treat her fairly, because "I was a young child and he expected me to help babysit and take care of his kids and make meals and things like that and feed them even though I was, um, a little young for that and he was the adult of the house."  E.C. agreed, however, that the children were her siblings and that she was between ages 12 and 14 at the time.

¶ 11    Catherine Scott testified that she is E.C.'s mother.  She married defendant in January 2015, and, at the time of trial, they were getting divorced.  Defendant is the biological father of three of her children.  She clarified their birthdates, specifying that D.M. (the brother whose birthday E.C. could not recall) was born on October 31, 2018.

¶ 12    In August 2020, Scott and defendant separated, and defendant moved out of the home.  Despite the separation, defendant and Scott had an informal arrangement whereby defendant would see his children and either pick them up from home in the afternoon or on Saturdays.  On October 8, 2021, after a conversation with E.C., Scott went to the Kane County Sheriff's Office and, then, on October 21, 2021, the child advocacy center.  Scott agreed that October 2021 was the first time E.C. told her about the incidents with defendant.  However, E.C. texted her once, when she was at work, saying that defendant made her feel uncomfortable and asked her to come upstairs to his bedroom with him because he was lonely.  Scott told E.C. not to do that, because

that did not "sound right," and Scott spoke to defendant about it. The only thing E.C. reported to her was that she was uncomfortable, so Scott did not contact the police. She agreed that E.C. and defendant did not "get along especially well." Some of Scott's fights with defendant, prior to their separation, occurred because he treated E.C. unfairly and wanted Scott to issue harsh punishments for minor infractions when E.C. was only eight or nine years old. She did not recall E.C. complaining that defendant made her babysit the younger children.

¶ 13     Scott confirmed that they frequently ordered a seafood tray from Las Islas Marias, a restaurant in Elgin, that was approximately 15 minutes away from their home in St. Charles. She also testified to her work history and schedule, as well as childcare arrangements.

¶ 14     Deanna Velazquez testified that she is employed by the sheriff's department and is a detective assigned to the child advocacy center. Someone else conducted E.C.'s interview, but Velazquez observed it. Near the end of the interview, in addition to defendant, E.C. mentioned sexual contact with another male, but the video malfunctioned and cutoff at that point.

¶ 15     The State rested, and defendant moved for a directed finding on all counts. The court asked the State to respond by specifying the evidence it had presented to satisfy its burden on each count. With respect to count II, the State noted E.C.'s testimony that, when she was younger than in middle school, although she could not recall her age, defendant came into her bedroom while she was sitting on a beanbag chair and he unzipped the onesie that she was wearing and touched her chest. Regarding count III, the State referenced E.C.'s testimony,

> "[I]n general that the defendant touched her multiple times in the chest. But the bedroom incident that I've described earlier was what she described as the big specific incident that she could remember as to being touched on the chest by the defendant. And

as to being touched on the chest, I believe, is when she testified that she was touched by the defendant from when she was 12 to 14 years old."

¶ 16 The court granted defendant's motion as to counts III and IV (the State conceded that it had not met its burden on count IV). With respect to count III, the court stated that it did "not find that the victim stating she has been touched on the breast numerous times is specific enough information to sustain a finding of guilt on that particular count."

¶ 17 Defendant testified through a court-appointed Spanish interpreter. Since 2015, he has been employed working 12-hour shifts with Welch Brothers, which provides concrete drainage tubes, as well as (until 2020) working a part-time job with Greco & Sons. He considered himself the primary breadwinner for the family. When working both jobs, he had very little time at home, although he had off on Saturdays. Defendant testified that he has three children with Scott and, while he had a good relationship with one of his stepdaughters, that was not the case with E.C., as they "always fought." Counsel asked defendant what they fought about or what caused stress on their relationship, but the court sustained the State's hearsay objections to those questions and struck any answers that had been received. Defendant explained that Scott had another child after their separation, but he is not the father.

¶ 18 Defendant married Scott in 2015, and he helped purchase the home in St. Charles, although it is in Scott's name, as well as pay for back taxes, remodeling, and repairs to a residence she owned in Poplar Grove. Defendant agreed that he knew the Elgin restaurant Las Islas Marias and testified that it was around 20 to 25 minutes from the St. Charles residence. He testified that they ate there occasionally but, as it was a seafood restaurant and not much to the family's liking, they did not eat there frequently. Defendant testified that he never drove with E.C. to Las Islas Marias, never touched her in a car, and never put his hand in or around her vagina in a vehicle.

¶ 19 Defendant testified that the living room included a television in front of an "L-shaped" couch. Between his two jobs, it was very rare for him to be in the living room while the rest of the family was awake, but, on his evenings off of work, the family would all be there. It was the busiest room in the house, with bouncy chairs and pack-and-play cribs for the younger children, and there were almost always multiple people in the room. There were occasions during which the entire family would watch movies or television in the living room. Defendant was asked if he ever used a blanket on the couch, and he responded, "If I was cold, I would put the blanket on or maybe one of the kids will use it." Counsel asked, "So there was a blanket?" Defendant answered, "No. There was not a blanket. It's just that sometimes, the baby, they had a blanket that they liked, so they would bring it with them." Defendant testified that he never put a blanket over himself and E.C. in the living room or touched her breasts or vagina on the L-shaped couch.

¶ 20 Defendant testified that E.C. had a lofted bed and beanbag chair in her room. He testified that he never entered her room and touched her breasts. While the youngest children would wear onesie-style pajamas with a full-length zipper, the older children would wear pants and a big shirt as pajamas. He never saw his stepchildren wearing onesies, including when E.C. was age 9 or 10 or thereafter.

¶ 21 Defendant testified that he never tried to force E.C. to kiss him, never entered her bedroom drunk, and he never tried to force her hand to touch his penis. He testified that he is 6 feet 4 inches tall, and he stood up to demonstrate in court that the lofted bed in her room was, for him, approximately neck height. Underneath the lofted bed, there was a desk, bookcase, and chair, and while it was easy for a small child to go underneath and sit down, he would have to bend over to access it.

¶ 22    Since his separation from Scott in 2020, he saw only his biological children on Saturdays or occasionally during the week in the afternoon.

¶ 23    The defense rested, and the court heard closing arguments. We note that, in part, defendant asserted that E.C. had raised similar allegations against another man and her allegations here might be confusing defendant with that man. The State, in turn, emphasized that E.C. had no motive to fabricate her testimony, whereas defendant "definitely has a motive and bias to fabricate and make things sound better for him, and it's because he doesn't want to be convicted of crimes."

¶ 24    On June 28, 2023, the court found defendant guilty of all remaining charges. The court summarized E.C.'s testimony and found:

> "The Court finds the victim extremely credible. She recalls certain acts in very much detail like going to get the seafood tray, what defendant was wearing, the one incident that it happened on the couch. And when she gave the answer that she did not want to tell because she wanted her siblings to have a normal childhood, I find that a very believable answer from her. She didn't tell—say she didn't want to tell because of any other reason the defendant had said to her. And I found that very credible. Again, on the incident on the couch, she said that happened before [D.M.] was born. *** [E.C. was] 11 years of age when he was born. So that happened before when she was [age] 11 or before"

¶ 25    The court noted that E.C.'s testimony was somewhat corroborated by Scott, such as with respect to the seafood platter, and that defendant also acknowledged that, despite his busy work schedule, there were times he was home with the family to watch movies and that he was familiar with the seafood restaurant. As such, the court found that the case came down to credibility determinations. It noted that E.C. was not impeached; rather, her credibility was questioned only regarding the timing of her coming forward and her disagreements with defendant. But the court

found she had a "very valid" reason for not speaking out when the events happened and had a "very specific memory about very specific acts." In contrast, the court found:

"As far as the defendant's manner while testifying, he looked down a lot. I did not find him to be very credible.

He certainly had a reason, a motive, to fabricate his testimony. He contradicted himself, I believe, I don't have the transcript of his testimony but on direct—or cross, I'm not sure which one, he said, first he used a blanket on the couch when he was cold. And then he said in the next sentence or answer, only the babies used the blankets. So to me he was trying to lessen his involvement in this."

¶ 26 In sum, the court found E.C.'s testimony positive and credible, even if contradicted by defendant, and entered a judgment against him on counts I, II, V, VI, and VII.

¶ 27 The court denied defendant's motion for a new trial and, on September 14, 2023, sentenced him to seven years' imprisonment on count I (count V merged with count I), consecutive to: (1) concurrent four-year terms of imprisonment on counts II and VI, and (2) two years' imprisonment on count VII. Defendant appeals.

¶ 28                                    II. ANALYSIS

¶ 29                          A. Impact of Directed Finding

¶ 30 Defendant argues first that the court's directed finding on count III estopped a guilty finding on the "exact same charge" in count II and that double jeopardy precluded him from being convicted under count II. He asserts that the verdicts were inconsistent and that, although this

issue was not raised in his posttrial motion, it should be reviewed for second-prong plain error. For the following reasons, we agree.[1]

¶ 31    A trial court should grant a motion for directed verdict only if all of the evidence, viewed in the nonmovant's favor, so overwhelmingly favors the movant that no contrary verdict could possibly stand. *People v. Hancock*, 2014 IL App (4th) 131069, ¶ 24.  We review *de novo* a court's ruling on a motion for directed verdict.  *Id*.  Similarly, whether verdicts are legally inconsistent is a question of law, which we review *de novo*.  *People v. Price*, 221 Ill. 2d 182, 189 (2006). Moreover, the plain-error doctrine "bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).  Even if forfeited, second-prong plain-error review may be applied to a claim that verdicts are inconsistent.  *People v. Bush*, 2022 IL App (3d) 190283, ¶ 102.  However, we must first assess whether there is error, *i.e.*, whether the verdicts for counts II and III are inconsistent.

¶ 32    Here, both counts II and III alleged aggravated criminal sexual abuse based upon the same conduct.  Specifically, they alleged that defendant, E.C.'s family member, committed "an act" of sexual conduct with E.C., who was under age 18 at the time, in that he touched her breast with his hand for the purpose of sexual arousal or gratification.  See 720 ILCS 5/11-1.60(b) (West 2020). As previously noted, the indictment contained identical language for the charged conduct in both counts, with the sole exception being the date range within which the conduct allegedly occurred.

---

[1]We note that defendant's assertion that the court's verdicts on counts II and III were inconsistent, suffices to frame the issue for our analysis, and we need not delve into the areas of collateral estoppel and double jeopardy.

Notably, count III had a *broader* range (on or about June 12, 2016, through July 31, 2021) than count II (on or about June 12, 2016, through June 11, 2019). Defendant argues that, because the alleged offenses were charged identically and the burdens of proof were the same, the court's finding that the State failed to sustain its burden on count III was completely at odds and inconsistent with its decision to not also grant a directed finding on count II and, ultimately, to allow continued prosecution and a conviction on that count.

¶ 33    The State contends that this issue is forfeited but, in any event, argues that the court's directed finding on count III was based on its determination that E.C.'s testimony that defendant touched her breast multiple times was insufficient to support a verdict for a "second act" of defendant touching E.C.'s breast. It notes that the court did not make a finding that any specified element was absent in count III. The State further notes that, when asked by the court to explain the evidence that supported each count, the State pointed to E.C.'s testimony about being touched in her bedroom while wearing a onesie to support count II, while, for count III, it referenced her testimony that defendant touched her breasts "multiple times," even though she could provide specific details about only the bedroom incident. According to the State, the court's findings, therefore, simply directed, based upon the way the evidence came out at trial, that only one count could be sustained for defendant touching E.C.'s breast.

¶ 34    "Verdicts are legally inconsistent when an essential element of each crime must, by the very nature of the verdicts, have been found to exist and to not exist, even though the offenses arise out the same set of facts." *Bush*, 2022 IL App (3d) 190283, ¶ 103. Although it concerned unanimous verdicts and, thus, is not directly on point, we find some persuasive guidance in *People v. Filipiak*, 2023 IL App (3d) 220024. There, an indictment identically charged two counts of predatory criminal sexual assault of a child, except that one count specified only that it was for "a

different act than alleged in" the other count. Although multiple acts were discussed at trial, the jury convicted the defendant of only one count. On appeal, the court agreed with the defendant that, because the State did not adequately distinguish between the two counts, his acquittal on one count made it impossible to tell if the jury unanimously convicted him of the same specific conduct for the second count. *Id.* ¶¶ 16-18.

¶ 35    Here, we likewise have both multiple charges and acts raised at trial, but the State did not differentiate, in either the charges themselves or argument to the court, the counts as being based on different acts. When ruling on count III, the court announced that it did "not find that the victim stating she has been touched on the breast numerous times is specific enough information to sustain a finding of guilt on that particular count." Yet, when advocating that the evidence supported count III, the State did not merely rely upon evidence that defendant touched E.C.'s breast "multiple times." Rather, it argued to the court that the evidence in support of count III was E.C.'s testimony "in general that the defendant touched her multiple times in the chest. *But the bedroom incident that I've described earlier* [*i.e.*, when arguing regarding count II] was what she described as *the big specific incident* that she could remember as to being touched on the chest by the defendant. And as to being touched on the chest, I believe, is when she testified that she was touched by the defendant from when she was 12 to 14 years old." (Emphasis added.) In other words, the State *again* urged the court to find it sustained its burden on count III by relying primarily on the bedroom incident. Thus, although the court referenced insufficient evidence to support being touched multiple times, the judgment itself *encompassed* the bedroom incident. Indeed, again, the language in the indictment was identical for both counts except, notably, that the date range for count III subsumed and/or included the date range for count II. As such, by entering its judgment on count III, the court effectively determined that the State *did not* satisfy its

burden of establishing that defendant committed "an act" of touching E.C.'s breast with his hand for the purpose of arousal between June 12, 2016[,] and July 31, 2021, which is *also* when the bedroom incident allegedly occurred. Accordingly, we agree that it was legally inconsistent to find, with respect to count II, that the State *did* satisfy its burden of establishing that defendant touched E.C.'s breast with his hand for the purpose of arousal within that period, *i.e.*, between June 12, 2016, and June 11, 2019. As such, under second-prong plain error, defendant's conviction and four-year sentence for count II must be vacated.

¶ 36                                  B. Sufficiency of Evidence

¶ 37     Defendant next challenges the sufficiency of the evidence to sustain his convictions. We review a challenge to the sufficiency of the evidence in the light most favorable to the State, asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). It is not our job to retry the defendant on appeal, and we may not substitute our judgment for that of the trier of fact as to witness credibility or the weight to give any testimony. See *People v. Phelps*, 211 Ill. 2d 1, 7 (2004); *People v. Jenk*, 2016 IL App (1st) 143177, ¶ 46. Rather, "in a bench trial, it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Moreover, it is well-established that "the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *Id.*

¶ 38     First, defendant argues that the State failed to prove the elements of sexual arousal or gratification required by counts II and VII. We have already vacated his conviction on count II, and, thus, we consider here only count VII, the conviction for indecent solicitation of a child. With

respect to that count, defendant notes that, to prove indecent solicitation of a child, the State needed to establish that he solicited E.C. to touch his sex organ for the purpose of sexual arousal or gratification. 720 ILCS 5/11-6(a), 11-1.60(b) (West 2020). Here, he argues, proof of this element was entirely missing, because the State fail to establish that he even solicited her to touch his sex organ, let alone for sexual arousal or gratification. He notes that E.C. testified only that defendant came home from work drunk, asked her to rub his stomach, and then grabbed her hand and tried to force it down his pants. Further, she did not see his clothes change in any way, and she confirmed that he did not successfully place her hand on his private part. E.C. ultimately pushed him off and left the room. Citing *People v. Ostrowski*, 394 Ill. App. 3d 82, 92 (2009), defendant suggests that the inference of sexual arousal could be rebutted by his alleged intoxication, and, in any event, that there was simply no testimony that he intended for E.C. to touch his sex organ, that her hand was forced down the front of his pants, as opposed the side or the rear, or whether defendant was wearing underpants under his sweatpants. Finally, the fact that E.C. did not remember anything changing or happening to defendant's clothing suggests that there was no erection or other evidence of sexual arousal or gratification. Thus, defendant argues, while the evidence viewed in the State's favor might demonstrate inappropriate conduct, it failed to demonstrate beyond reasonable doubt that his actions were for purposes of sexual gratification or arousal. We disagree.

¶ 39    The evidence concerning this charge, viewed in the State's favor, was sufficient to sustain defendant's conviction. E.C. testified that defendant came home from work drunk and that Scott was at work. She and defendant were in the living room, he wore Mickey Mouse sweatpants, and no one else was around. Defendant asked E.C. to rub his stomach and then he grabbed her hand and tried to force it down his pants. Defendant pulled his pants down, and E.C. pushed him off

and went to her room. Defendant followed E.C. and asked her to go to his bedroom to sleep with him. E.C. texted Scott and told her defendant was making her uncomfortable, and Scott corroborated that she once received a text from E.C. that defendant had been in her room and made her uncomfortable because he asked her to go upstairs with her, as he felt lonely. At that time, Scott told E.C. that the behavior did not "sound right." We note that the element of sexual arousal or gratification can be established by circumstantial evidence, and intent can be inferred from the conduct. *In re Matthew K.*, 355 Ill. App. 3d 652, 655 (2005) ("When the accused is an adult, a factfinder can infer that an accused intended sexual gratification"). Moreover, the allegations in this case are markedly different from those in *Ostrowski*, where we determined that, based on *numerous* circumstances, no rational trier of fact could have found that kisses between a grandfather and granddaughter at a public festival while playing on the ground were given for the purpose of sexual gratification or sexual arousal, including because the conduct was performed in a public place in close proximity to numerous witnesses and all witnesses testified that the defendant was visibly intoxicated. *Ostrowski*, 394 Ill. App. 3d at 95. Here, the alleged conduct is more serious than kissing, and the inference of sexual gratification is not rebutted by public behavior, as defendant and E.C. were alone. The fact that E.C. did not witness a change to defendant's clothing could reflect only that his solicitation was ultimately unsuccessful and it does not warrant a conclusion that his intent was not one of sexual gratification or arousal.

¶ 40 Defendant next argues that the evidence was unreasonable, improbable, and simply insufficient to establish beyond a reasonable doubt that he was guilty of count I, predatory criminal sexual assault. Specifically, where the charge required the State to prove that he touched E.C.'s sex organ when she was under age 13 (720 ILCS 5/11-1.40(a)(1) (West 2020)) and where defendant testified that he never touched her breasts or vagina on the L-shaped couch, he argues

that the evidence was insufficient to sustain his conviction. Defendant notes that, according to E.C., he touched her on the couch when she was in middle school (when she was between 12 to 14 years old), when her mother and siblings were also present, and when D.M. was not yet born. She recalled that D.M. was born during the 2020 pandemic shutdown but was confused and could not recall his actual birthdate. Thus, defendant contends, regardless of her confusion over D.M.'s birthdate, E.C. was not confused that it allegedly happened in middle school, when she could have been over age 13. Further, defendant argues, the conviction must be called into question because of the "bizarre circumstances" E.C. described. He points out that E.C. and Scott agreed that E.C. and defendant had many arguments but, notwithstanding that fact and that he allegedly touched her on the couch with her mother and other family members seated on an adjacent portion of the couch, E.C. never complained about defendant to Scott until October 2021, even though defendant had moved out more than a year earlier (August 2020). Given the improbable evidence here, he argues, we should reverse his conviction. For the following reasons, we disagree.

¶ 41 As the State notes, E.C. testified that she did not say anything to her mother because she wanted her siblings to have a normal childhood with their father and because defendant told her that her mother needed him, no one would believe her, and people would think she was a "slut." The court found E.C. "extremely credible," her reasons for not speaking out "very valid," and her memory of the acts "very specific." Indeed, the court could have reasonably found that E.C.'s delay in reporting was attributable to "fear of the offender or to the shame, guilt and embarrassment. *** In sexual assault cases involving family relationships, the victim's credibility is not lessened if there is no immediate outcry." *In re M.G.*, 2024 IL App (1st) 232106, ¶ 29. Defendant makes much of the fact that, while these reasons might make sense *while* the alleged events were happening, they simply do not credibly support E.C.'s delayed reporting for more than

one year *after* defendant was out of the home, particularly given their known contentious relationship. Simply put, the trial court rejected this argument, found E.C. credible, and did not find the existence of reasonable doubt based upon the delayed reporting. It is not our function to reweigh witness credibility or the evidence (*Siguenza-Brito*, 235 Ill. 2d at 228), and we do not believe that E.C.'s testimony was inherently incredible. Finally, we note that, despite E.C.'s testimony that the event occurred in middle school, the court believed her testimony that the event happened before D.M. was born. The court then specifically found, on that basis, that E.C. was under age 13 when the event happened, because the evidence established that D.M. was born on October 31, 2018, making E.C. age 11 or younger at the time of the assault. We cannot attribute different weight to the evidence or conclude that no rational finder of fact could have found defendant guilty. *Id.*; *Collins*, 106 Ill. 2d at 261.

¶ 42    Finally, defendant challenges the sufficiency of the evidence for count VI, pertaining to his alleged touching of E.C.'s sex organ in the car on the way to a restaurant. He again argues that the evidence was so unreasonable and improbable as to create reasonable doubt as to his guilt. Defendant notes that E.C.'s testimony was vague and that she testified only that, sometime when she was in middle school and while driving to pick up a seafood tray, defendant reached over and put his hands down her shorts. He notes there was no detail about the season, the clothing they purportedly wore, the vehicle's interior, whether anything was said, what time of day or evening it occurred, etc. As such, given the dearth of detail, all defendant could do to defend himself was take the stand and deny the act itself and that he ever drove E.C. in a vehicle to the restaurant. Defendant again notes that the lack of surrounding facts, coupled with the fact that, despite a running feud that was known within the household, E.C. registered no complaints about this to Scott until October 2021, when defendant had been out of the home for more than one year.

Defendant argues that, in total, this scenario was simply so improbable and contained such a paucity of facts that we should reverse his conviction.

¶ 43    We agree with the State that the evidence regarding count VI was not as vague as defendant portrays it.  E.C. testified that she and defendant drove to a seafood restaurant that was near her home in St. Charles to pick up a seafood tray.  Although she could not recall the name, she and her family had food from there before.  She explained that she sat in the front passenger seat when defendant reached over, put his hands down her pants and underwear, and touched her in and around her vagina, felt around "down there," and was "actually going inside."  After they picked up the tray, E.C. put the tray on her lap so that defendant could not touch her again.  Defendant and Scott both testified that, indeed, the family had ordered food from a seafood restaurant in Elgin, near their St. Charles home, and that it included seafood trays.  Again, in sum, it was the trial court's function to weigh the credibility of the evidence and, viewing the evidence in the State's favor, we cannot conclude no rational trier of fact could have found defendant guilty.

¶ 44    We note that defendant takes issue with the fact that the trial court based its adverse credibility assessment of him on the bases that he "looked down" and had a motive to fabricate testimony to escape conviction.  Indeed, he notes, he was in a linguistically and culturally challenging position, had no criminal history whatsoever but was facing very serious charges, and his only "linguistic lifeline" to the proceedings was a Spanish interpreter.  Defendant contends that he may have had many reasons to look down during his testimony other than a lack of credibility and, further, that the presumption of innocence is "in serious trouble" if a trier of fact may draw a negative credibility inference or motive to fabricate simply because a defendant charged with serious offenses takes the stand to testify.

¶ 45    Candidly, defendant raises interesting concerns.  However, we presume that trial courts know and follow the law (see, *e.g.*, *In re Alexander R.*, 377 Ill. App. 3d 553, 556-67 (2007)) and, here, we presume that the court based its credibility assessment on appropriate factors and accounted for the language barrier and any delays that the translation process might have on defendant's physical presentation while testifying.  We read the court's credibility comments here as simply explaining why it found E.C. "extremely credible" and as somewhat echoing the State's closing argument about why E.C. lacked a motive to lie, whereas defendant had much to lose.  Again, the trial court was in a much better position than we are to determine witness credibility *overall*, as well as the weight to afford the witnesses' testimonies.

¶ 46                                   III. CONCLUSION

¶ 47    For the reasons stated, we vacate defendant's conviction and sentence on count II but otherwise affirm the judgment of the circuit court of Kane County.

¶ 48    Affirmed in part; vacated in part.